CHAMBERS BUILT INS Co. *v.* RABB.

5-2980                                          370 S. W. 2d 39

Opinion delivered May 6, 1963.
[Rehearing denied September 9, 1963.]

546

*Shackleford & Shackleford,* for appellant.

*Harry Crumpler, Brown, Compton* and *Prewett,* for appellee.

GEORGE ROSE SMITH, J. The appellant, a manufacturer of cooking stoves, appeals from a verdict and judgment awarding the appellees $20,000 as compensation for severe burns suffered by their two-year-old daughter, Debra Dianne Rabb. The appellees' complaint alleged that a defect in their kitchen range, which had been manufactured by the appellant, caused a container of grease to catch on fire and injure the child. The serious question in the case is whether there is any substantial evidence to support a finding that the fire was in fact caused by a defect in the above.

Mr. and Mrs. Rabb bought the stove new in 1959. It had been used in the preparation of two meals a day for about three weeks when the fire occurred on the evening of September 8. That night Mrs. Rabb, in preparing supper, fried potatoes in about two quarts of grease in the stove's deep well. Near the end of the meal, which was eaten at a table about two feet from the stove, the door to the storage compartment in the lower righthand part of the stove fell open. Both Mr. and Mrs. Rabb testified that they could see smoke and flame in the compartment, and the grease in the deep well was on fire. Mrs. Rabb at once carried her little daughter out of the house. Mr. Rabb used a garden rake to pick up the container of burning grease and carry it outside. Just after he had backed through the door, however, Debra Dianne threw her arms around his legs and caused the hot container to fall off the rake, splashing burning grease upon the child.

Throughout the case the appellant's theory has been that Mrs. Rabb, after cooking the French fried potatoes, forgot to turn off the burner under the deep well, so that the grease became so hot that it caught on fire. Mr. and Mrs. Rabb testified that the burner was turned off; but,

if they were mistaken about this, there is an abundance of evidence showing that the failure to turn off the burner under the grease could have caused the fire. This testimony is in effect uncontradicted and need not be set out in detail.

To meet their burden of proving a defect in the stove the plaintiffs relied upon the testimony of C. B. Lampkin, a qualified appliance repairman. Lampkin examined the damaged range about a month after the fire, when, following Debra Dianne's release from the hospital at El Dorado, the Rabbs returned to their home at Magnolia. Lampkin found two loose mounting screws at a point where there was a gasket a few inches below the right front top burner on the stove. He said that gas escaping from the leaky gasket would be ignited ''almost instantly'' by the pilot light for the right front burner. On cross examination he said that if the screws had been loose all along he did not think the stove could have been used for three weeks without a fire.

Lampkin's testimony, viewed in its most favorable aspect, would support a finding that the loose connection had caused gas to be ignited by the pilot light at a point just below the right front top burner, which would place the fire in the upper front area of the storage compartment. It was still necessary, however, for the plaintiffs to show that flames originating in this area could in turn cause the grease in the deep well to catch on fire. Upon this vital point we can find no evidence to support the jury's conclusion that the defective connection was the proximate cause of the fire in the deep well.

The deep well extended downward from the right rear section of the top of the stove. The well itself was a hollow metal cylinder, open at the top and the bottom. Rock wool about an inch and a half in thickness was wrapped around the outside of the well, for insulation. The well was heated by a gas burner at the bottom of the cylinder. The removable container, which at the time of the fire was filled with grease to about two-sevenths of its capacity, was placed in the metal cylinder when being

used for cooking. There was a lid for the well, which Mrs. Rabb put back in place after she fried the potatoes.

The fatal weakness in the appellees' proof is the complete absence of any evidence tending to show how a gas flame in the upper front area of the storage compartment could have ignited the grease in the deep well, in the lower rear section of that compartment. There is no proof whatever that the flame could have come in direct contact with the grease. To the contrary, the substance of Lampkin's testimony on this point is that the leaking gas could not have lit the grease: ''You cannot ignite grease in the deep well from anything on the outside.'' This statement by the witness is unquestionably a correct summation of the situation. With the lid covering the deep well the flames could not have come up through the opening around the front burner, traveled to the back of the stove, and then made their way past the lid in order to descend to the grease at the bottom of the well. Nor, since natural gas is lighter than air, could the fire have traveled downward in the storage compartment to enter the bottom of the cylinder, then up to the top of the metal container, and then down again to reach the grease. There is no possibility that leaking gas could have filled the compartment before igniting, for Lampkin himself testified that the gas would have been ignited almost instantly from the pilot light close by. Finally, there was no explosion. Neither Mr. nor Mrs. Rabb testified that an explosion occurred, and Lampkin said that gas leaking from the loose gasket would have been ignited by the pilot light without an explosion.

There being no proof that the flames came in direct contact with the grease, the only alternative basis for a recovery would be a showing that the flames played against the outside of the deep well and heated it to such an extent that the grease caught on fire. The record contains no evidence to support such a conclusion. Lampkin and one of the appellees' attorneys were invited to attend, and did attend, a demonstration at which the appellant undertook a reproduction of the alleged fire. It was found that if the deep-well burner was not turned off, as the ap-

pellant insists to have been the case, the grease would become overheated to the point of catching on fire in an hour and ten minutes. The effect of Mr. Rabb's testimony was that an hour and ten minutes elapsed between the time when his wife started to cook and the time of the fire. Mrs. Rabb fixed the time at about forty minutes.

At this demonstration the appellant also loosened the mounting screws in question, upon a stove of the same model, and permitted the leaking gas to ignite from the pilot light and burn freely in the upper part of the storage compartment. The grease had first been used to fry potatoes. It was found that its temperature, instead of going up, actually decreased. This is not surprising, in view of the fact that the grease not only was below the point where the heat was applied but also was insulated by the rock wool, the wall of the metal cylinder, the intervening air space, and the wall of the removable container. Moreover, it should be pointed out that the appellant's attempted reproduction of the fire was not in the nature of surprise testimony produced for the first time at the trial. The appellees' lawyer and their expert witness were both invited to view the demonstration well in advance of the trial, so that there was ample opportunity for a rebuttal.

It is fair to say that the appellees have never, in their proof, in their brief, or in their oral argument in this court, demonstrated *facts* upon which it could be found that the leaky gasket caused the grease in the deep well to catch on fire. In effect they bypass this problem, by contending that if Mrs. Rabb turned off the burner under the deep well, as she testified, then the fire could only have come from the defect in the stove. But this argument ignores the vital issue of causation and would permit the jury to find a causal connection when no witness in the case was able to do so.

Reversed and remanded.

McFADDIN, JOHNSON, and HOLT, JJ., dissent.

ED. F. McFADDIN, Associate Justice (dissenting). I dissent because I maintain that a case was made for the

jury. As I read the Opinion, the Majority is in effect holding that the plaintiffs, in order to recover in a product liability case like this one, have to prove to a mathematical certainty exactly how the established defect in the product caused the injury. I dissent because such is not my understanding of the applicable rule of law.[1] The plaintiffs proved these essentials: (a) that there was a leak of gas in the stove caused by a defect; (b) that there was a fire in the stove caused by the leaking gas; (c) that the grease caught on fire; and (d) that in removing the flaming grease the little girl was injured. I maintain that when the plaintiffs proved these four points they made a case for the jury and it then became a question of whether the evidence offered by the defendant overcame the evidence offered by the plaintiffs.

At the outset, let me mention these four essentials:

A. *That there was a leak of gas in the stove caused by a defect,* was established by the witness Lampkin, who found the loose screws and stated where the burned places were on the stove.

B. *That the leaking gas caught on fire* was thoroughly established by the testimony of both Mr. and Mrs. Rabb. I quote the testimony of Mrs. Rabb:

"Q. Tell the jury then what happened as you were sitting there at the table, what happened with reference to the stove?

A. We were sitting at the table nearly finished or finished, and there was kind of a spewing sound and the storage compartment door fell down and then there was smoke and a little flame.

---

[1] In the case at bar the complaint alleged: " . . . that the explosion in said stove and the resulting fire and injuries occurred as a result of the surface burner control unit (referred to as a 'Thermal Eye' by the manufacturer) not being properly secured to the mounting plate, which is connected to the gas supply line. As a result, gas leaked between said unit and the mounting plate and this gas was ignited by the pilot light and the resulting flames ignited the grease contained in the deep well vessel." The answer of the defendant " . . . admits that the deep well cooking container on said range ignited, but denies there was any explosion . . . " *Res ipsa loquitur* does not seem to have been brought into this case in any way. It is a straight issue of whether the defendant was negligent and whether the injuries resulted therefrom.

Q. You say there was sort of a spewing sound, — can you make a noise similar to it?

A. (Witness illustrating.)

Q. And you say the door fell down?

A. Yes, sir.

Q. And then you saw smoke and some flame?

A. Yes, sir.

Q. What part of the stove did you see smoke and flame?

A. The right hand side.

Q. Toward the front or toward the back?

A. Around the front.

Q. By around the front, — would that be around this thermal eye burner?

A. Yes, sir, and under it.

Q. Under what?

A. Under the thermal eye burner and the storage compartment.

Q. You mean the storage compartment and underneath this thermal eye?

A. Yes, sir.

Q. Where else did you see smoke and flame?

A. Up on the eye and the deep-well.

Q. When you took the potatoes out, did you put the lid on the deep-well?

A. Yes, sir.

Q. Where was any smoke or fire with reference to the deep-well?

A. Just around the edge.''

Whether one calls the storage compartment door falling down an explosion or not is immaterial. The point

is that the compartment door fell down, and there were both smoke and flame; and Mrs. Rabb observed the flame, not only in the stove, but in the deep-well.

C. *That the grease caught on fire* is likewise established by the testimony of Mrs. Rabb, as above quoted, and also the testimony of Mr. Rabb; and also by the fact that the grease was on fire when some of it fell on the little girl.

D. *That in removing the flaming grease the little girl was injured* was thoroughly established. The causal connection between Mr. Rabb removing the flaming grease and the injury to his daughter is not discussed in the Majority Opinion, but I mention that there was a causal connection. (*Hill* v. *Wilson*, 216 Ark. 176, 224 S. W. 2d 797.) Mr. Rabb did what a person of ordinary prudence would have done in removing the grease; and the little girl, in grabbing her father's leg, could not be charged with negligence.

With these four essentials mentioned, I come to the question of whether the plaintiffs had to trace with mathematical accuracy how the defect in the stove, that allowed the gas to escape, caused the grease to catch on fire. I maintain that when the plaintiffs showed the four essentials above mentioned, they made a *prima facie* case for the jury.[2] Volumes have been written on products liability cases,[3] but I mention only a few which bear on

---

[2] It was stated in oral argument before this Court, and undenied, that the Rabb stove was delivered to the defendant's retailer in Magnolia after the fire, and that the plaintiffs had no further connection with the stove. The record before us contains testimony as to experiments conducted by the defendant on *other stoves*. Whether the experiments on the other stoves could have been shown if an objection had been made is a matter that need not be discussed, because it does not appear that the plaintiffs made any such objection.

[3] In 80 A. L. R. 2d 488 there is an extensive annotation on the subject, "Liability of manufacturer or seller for injury caused by firearms, explosives, and flamables"; and in 80 A. L. R. 2d 598 there is an extensive annotation on the subject: "Liability of manufacturer or seller for injury caused by household and domestic machinery, appliances, furnishings, and equipment." In 52 A. L. R. 2d 159 there is an annotation on: "Presumption or *prima facie* case of negligence based on presence of foreign substance in food in can or other sealed container." Interesting cases examined on the points here at issue include these: *Otis Elevator Co.* v. *Robinson*, 287 F. 2d 62; *Reynolds* v. *Natural Gas Co.*, 7 Calif. Rep. 879; *Jaeger* v. *Elizabethtown Consolidated Gas Co.* (N. J.), 11 A. 2d 746; *Hilson* v. *Pac. Gas & Elec. Co.* (Calif.), 21 P. 2d

the point here at issue. One of the leading cases is *Skelly Oil Co.* v. *Holloway* (8th Cir.), 171 F. 2d 670; and the scholarly opinion in that case was written by the late Judge Walter G. Riddick of Arkansas. The Holloways' home was destroyed by fire, which they alleged had been caused by propane gas allowed to escape because of the negligence of the Skelly Oil Company. The cause was tried before a Judge without a jury; and from a judgment for the Holloways, the Skelly Oil Company appealed, claiming that the plaintiffs had failed to prove that the fire was caused by the escaping gas. Judge Riddick said:

"The evidence revealed no other reasonably probable source of the fire, except the presence of gas throughout the walls and upper floor of the house. That the fire was first seen coming from the hole in the floor in the bedroom occupied by Elmer Holloway does not conclusively establish that place as the point at which the fire originated . . .

"Nor can it be said on this record that the court's finding that the fire was caused by escaping gas is contrary to conclusively established physical facts and natural laws. The argument on this aspect of the case is based upon known properties of Skelgas. Briefly stated, it is that within the time elapsing between the hour at which defendant's employees finished their work of inspection and repair and the discovery of the fire by Elmer Holloway, it was impossible, conceding the escape of gas, its diffusion, and mixture with air, for the mixture of air and gas in the open space between the rock ledge and the north wall of the lower floor of the house, between the joists supporting the floor on the second level of the house, and in the walls of the second floor of the house, to have reached a concentration above the explosive limit of Skelgas; or, in other words, that within the time specified any possible mixture of Skelgas and air, conceding that such a mixture could have occurred,

662; *Ky. etc. Power Co.* v. *Elliott*, 220 S. W. 2d 964; *Dixon* v. *Montgomery Ward* (Ill.), 114 N. E. 2d 44; *Ehler* v. *Portland Gas Co.* (Ore.), 352 P. 2d 1102; *Lindroth* v. *Walgreen* (Ill.) 94 N. E. (2) 847; and see annotation in 88 A. L. R. (2) 230 entitled "Expert and Opinion Evidence as to cause or origin of fire."

would have remained within the explosive limits of Skelgas, and that instead of a fire in the house there would have been an explosion at the instant of contact of the Skelgas-air mixture with flame.

"In support of this contention recourse is had to laws of physics concerning the rate of expansion of gases; the time required for two gases of equal temperature and pressure to mix by diffusion in the absence of the application of heat or mechanical action, such as the difference in pressure of the two gases; and to a generally accepted formula for the computation of the rate of the flow of gases. The difficulty with defendant's argument and computations is that too many of the decisive factors are only approximately known, if known at all."

The similarity between the argument of the Skelly Oil Company in the reported case, and the argument of the appellant in the case at bar, is instantly apparent. The Skelly Oil Company claimed that the fire could not have happened as the plaintiffs contended; but Judge Riddick affirmed the judgment for the plaintiffs; and I submit that the same result should follow in the case at bar.

Another case worthy of study is *Stadick* v. *Olson's Hardware* (N. D.), 64 N. W. 2d 362. There, a gas stove had exploded and injured the Stadicks, who sued the seller, Olson's Hardware. From a judgment for the plaintiffs the defendant appealed, insisting that the Court should have given a directed verdict for the defendant. The Supreme Court of North Dakota, in affirming the Trial Court, did not require the plaintiffs to show to a mathematical certainty every step from the defendant's negligence to the plaintiffs' injury. Rather, the Court said:

"When the explosion occurred the only fire in the house was in the two pilot lights on the stove. The explosion occurred when the oven was opened by the plaintiff. The conclusion is inescapable that the explosion was caused by an accumulation of free gas in or about the stove. How did the gas come to be there? It had escaped from the system in one of two ways — either a burner

was left partly open by the plaintiff or his wife or the gas escaped through a defect in the system.

"The plaintiff's wife testified that she checked all of the burner valves to see that they were closed when she retired. The plaintiff testified that he looked at the stove before he opened the oven door; and there was nothing wrong with it; and that the burner valves were off. If the testimony of the Stadicks is to be believed, the only reasonable inference is that the gas that exploded escaped from a defect in the system. The evidence produced by the defendants shows that if the system was properly installed there was no danger of leakage . . .

"The fact that a verdict was rendered for the plaintiff indicates that the jury found the evidence of the Stadicks to be credible. On the basis of their evidence it was logical for the jury to infer that their injuries resulted from the explosion of gas that had escaped from the system that had been improperly installed by the defendants, whose negligence in making such an installation was the proximate cause of the damages which the plaintiff suffered."

Without prolonging this dissent, I call attention to the case of *Alldread* v. *Mills,* 211 Ark. 99, 199 S. W. 2d 571. In that case there had been an automobile collision and the appellant insisted that the physical facts entirely disproved the appellee's right to recover. We rejected that plea about physical facts, saying:

" 'So frequently do unlooked-for results attend the meeting of interacting forces that courts, in such cases, should not indulge in arbitrary deductions from physical law and fact, except when they appear to be so clear and irrefutable that no room is left for the entertainment, by reasonable minds, of any other.' "

I maintain that it was for the jury to decide from the established facts in this case as to whether the little girl was injured because of the negligence of the appellant; and so I would affirm the judgment for the plaintiffs.